IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:11-cv-00715-RPM

NAVIGATORS SPECIALTY INSURANCE
COMPANY,

Plaintiff and Counterclaim Defendant,

v.

DOUGLAS BELTMAN; ANN MAEST; and
STRATUS CONSULTING, INC.,

Defendant and Counterclaim Plaintiffs,

v.

HARTFORD CASUALTY INSURANCE
COMPANY, HARTFORD FIRE
INSURANCE COMPANY, and TWIN CITY
FIRE INSURANCE COMPANY,

Counterclaim Defendants.

---

**BRIEF OF AMICUS CURIAE CHEVRON CORPORATION**

---

**TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................................................. 1

II. FACTUAL BACKGROUND................................................................................................. 6

III. ARGUMENT........................................................................................................................ 11

    A. Chevron's Complaint Includes Extensive, Detailed, and Specific Allegations Against Stratus...................................................................................... 11

        1. Chevron's Use of the Term "RICO Defendants" Does Not Erase the Extensive Individual Allegations Concerning Stratus ........................ 12

        2. The Complaint's Introductory and Summary Sections Do Not Erase the Many Specific and Substantive Allegations Elsewhere in the Complaint.............................................................................................. 13

        3. The Complaint Includes Numerous Allegations of Stratus's Wrongdoing .............................................................................................. 14

IV. CONCLUSION..................................................................................................................... 15

Pursuant to the concurrently filed Motion for Leave to File Brief of Amicus Curiae, Chevron Corporation ("Chevron") respectfully submits the following *amicus curiae* brief regarding recent filings in this action submitted by Defendants Stratus Consulting, Inc., Douglas Beltman and Ann Maest (collectively, "Stratus").

## I.   INTRODUCTION

Chevron's RICO Complaint in the Southern District of New York demonstrates that Stratus's core assertion that it simply "did [its] job and provided environmental consulting and technical services to indigenous Ecuadorians" is a fiction. And it is a fiction taken nearly verbatim from Stratus's briefs in a motion pending in New York. As the plaintiff in the RICO Action with a strong interest in the accuracy of the public record, Chevron submits this brief to apprise this Court of Stratus's misconduct and to correct Stratus's mischaracterizations of Chevron's RICO Complaint. Chevron takes no position on the insurance coverage dispute itself.[1] Chevron seeks only to correct the record as to the contents of its pending RICO Complaint.

Chevron's RICO Complaint lays out in great detail that, far from merely "following orders," Stratus has been an active participant in an ongoing scheme to extort and defraud Chevron out of billions of dollars. Among other wrongful acts, Stratus secretly authored the report of a supposedly "neutral" and "independent" "Special Master" in an Ecuadorian court that purported to find Chevron liable for $16 billion in environmental damages, then wrote "objections" to that same report claiming it was "unjustly favorable to the defendant [Chevron]", and drafted, again under the name of the Special Master (Richard Stalin Cabrera Vega) ("Cabrera"), a supplement

---

[1] On April 16, 2012, Stratus filed three briefs (Dkts. 46-48) opposing motions for summary judgment by Counterclaim Defendants Navigators Specialty Insurance Company (Dkt. 39), Hartford Casualty Insurance Company and Hartford Fire Insurance Company (Dkt. 41), and Twin City Fire Insurance Company (Dkt. 42). Chevron refers to Stratus's briefs collectively as the "Oppositions."

in response to those objections, which increased the damages to $27 billion. Back in the United States, Stratus promoted the Special Master's report to the press, to state and federal authorities, and to this District Court, as "independent" evidence of environmental harms, never once disclosing that it had in fact written the report itself. These are not mere allegations: the proof of these co-conspirators' offenses comes largely from their own mouths, captured on film outtakes and their own documents that federal courts throughout this country ordered disclosed.

When challenged in this District with evidence of its authorship, Stratus told Magistrate Judge Hegarty that it was "astonish[ed]" to learn that its work product appeared in the Special Master's report, that its work product was provided to the plaintiffs to be used in connection with a "mediation" and not "to assist Cabrera," and that Stratus did not have "an opportunity to review Cabrera's report in draft form." And when subsequent discovery—including *video* of Stratus Defendant Maest meeting with the Special Master to discuss writing his report even *before* his official court appointment, as well as emails from Stratus Defendant Beltman attaching copies of the report written by Beltman but bearing Cabrera's name—confirmed that Stratus had, in fact, ghostwritten the Cabrera Report, Judge Hegarty found that he "was not given the truth" by Stratus. Indeed, Stratus's co-conspirators confessed their crimes in internal documents when they realized Judge Hegarty was poised to require them to produce this ghostwriting evidence, acknowledging that, with such disclosure, "all of us (your attorneys) might go to jail," and "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active co-conspirator."

This District is not the only federal court to have weighed in on the conduct described in Chevron's Complaint. The District of New Mexico specifically identified Defendant Maest's

2

participation in a meeting with the Ecuadorian Special Master as an example of "inappropriate, unethical and perhaps illegal conduct." *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (JH/LFG), slip op. at 3-4 (D.N.M. Sept. 2, 2010); Dkt 39-6 ¶ 302.  The Western District of North Carolina, in reference to that same meeting, and to Stratus's subsequent ghostwriting of the Special Master's report, held that "what has blatantly occurred in this matter would in fact be considered fraud by any court." *Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1 :10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); Dkt. 39-6 ¶ 302.  In all, eight federal courts have found that the ghostwriting of the Special Master's report and related misconduct constituted evidence of a crime or fraud warranting piercing the attorney-client privilege.  *See* Appendix A.

Moreover, Judge Kaplan in the Southern District of New York made express factual findings of Stratus's central role in this conspiracy in granting Chevron a preliminary injunction against enforcement of this fraudulently procured Ecuadorian judgment (later vacated by the Second Circuit on procedural legal grounds while leaving those findings undisturbed):

> There is ample evidence of fraud in the Ecuadorian proceedings.  The LAPs, through their counsel, . . . orchestrated a scheme in which Stratus ghost-wrote much or all of Cabrera's supposedly independent damages assessment without, as far as the record discloses, notifying the Ecuadorian court of its involvement.  They submitted comments of Stratus, bolstering the Cabrera report, but without disclosing Stratus's prior participation.  Despite the apparent relationship between the LAPs and Cabrera, both parties repeatedly misrepresented to the Ecuadorian court that there was no relationship or any form of inappropriate contact that might prejudice Chevron in the proceedings.
>
> Cabrera was anything but independent and Stratus, in purporting to comment on Cabrera's work, in fact was commenting on its own—it actually had written all or most of the Cabrera report.
>
> Evidence indicates that Doug Beltman, other Stratus consultants, and subcontractors outlined and drafted substantial portions of the Cabrera report and many of its annexes and supervised their translation into Spanish until the document eventually was signed by Cabrera and submitted to the court.  In January 2008, Donziger,

3

> Yanza, Fajardo, Beltman, and Maest met secretly with Cabrera, likely to discuss the report that was being prepared for him to sign. In March 2008, Ecuadorian counsel for the LAPs "conveyed a substantial amount of information prepared by Stratus to Cabrera and may not have contemporaneously advised Chevron (or the Court) of that submission." E-mail exchanges among Donziger, Beltman, and other Stratus consultants confirm that Stratus drafted substantial portions of the Cabrera report and its annexes. An outline of the expert report includes a table that assigns each annex to a member of the Stratus team. There is a note below the table which reads: "need to figure out to whom Richard [Cabrera] will attribute each of the annexes," thus implying that the annexes would be supplied to Cabrera, but not attributed to the people who actually wrote them. A few weeks before the Cabrera report was submitted, Beltman sent Donziger a draft of the report for Donziger's feedback. And it appears to have been Beltman, copying Maest, who sent a complete draft of the report with Cabrera's name, in English, to a translation service less than three weeks before the report was filed.
>
> As the facts concerning the ghost writing of the Cabrera report first threatened to come and then came out in the Section 1782 proceedings, at least some on the Lago Agrio side became deeply concerned. One of the LAPs' Ecuadorian lawyers wrote to Donziger that the "effects" of disclosure could be "potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]" Moreover, although time does not permit detailed discussion of the evidence, there is extensive evidence that counsel for the LAPs and Donziger made Herculean and perhaps questionable efforts in the Section 1782 proceedings to prevent or delay the disclosure of material proving the roles of Stratus and other U.S. consultants in the Cabrera report.

*Chevron Corp. v. Donziger et al.*, 768 F. Supp. 2d 581, 604, 609-10, 636 (S.D.N.Y. 2011), *Chevron Corp. v. Camacho Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012) (vacating the preliminary injunction but expressing "no view on the merits of the parties' various charges and counter-charges regarding the Ecuadorian legal system and their adversaries' conduct of this litigation, which may be addressed as relevant in other litigation before the district court or elsewhere").

Stratus has represented to this Court that Chevron's claims against it in the RICO Action "are unsupported by any factual allegations." Dkt. 46 at 1. That is simply false. Stratus misleadingly cherry-picks quotes from Chevron's lengthy RICO Complaint to try to minimize the damning evidence against it by mischaracterizing the pleading as a case of "guilt by association"

4

by "impermissibl[y] lumping" in Stratus with the true wrongdoers. But Stratus is a true wrongdoer, and the overwhelming evidence described there proves it. Indeed, Stratus ignores over 200 specific and individual references to the Stratus Defendants in that pleading. Chevron's Complaint lays out, *in detail and by name*, the specific acts of each of the Stratus Defendants in furtherance of the criminal scheme. The Complaint quotes extensively from emails written by these Defendants, from their sworn deposition testimony, and from conversations captured on video tape by a filmmaker hired by the plaintiffs in the Ecuadorian action (the "LAPs") to document their lawsuit against Chevron. And Chevron has subsequently annotated its pleading with record evidence citations and submitted hundreds of original source materials in the RICO Action, including the aforementioned video footage, providing the evidentiary support for every quote and factual allegation in the Complaint. *See Chevron Corp. v. Salazar et al.*, No. 11-CV-3718 (LAK) (S.D.N.Y. June 16, 2011), Dkt. 45-1, Declaration of Kristen L. Hendricks in Support of Chevron Corporation's Motion to Compel Production of Documents from Joseph E. Kohn and Kohn, Swift & Graf, P.E., Ex. A.

Just prior to the submission of this brief by Chevron, the Southern District of New York issued its ruling on the motion to dismiss filed by Stratus's co-defendant, Steven Donziger, the U.S. attorney whom that court has previously described as the "field general" of the LAPs' campaign against Chevron. *See Chevron Corp. v. Donziger et al.*, No. 1:11-cv-00691-LAK, 2012 U.S. Dist. LEXIS 67207 (S.D.N.Y. May 14, 2012). The court upheld Chevron's RICO claim, rejecting Donziger's arguments that, *inter alia*, the Complaint sought an extraterritorial application of RICO, that the complaint pleaded only a "single scheme" and not a pattern of racketeering activity, and various attacks on the predicate criminal acts Chevron pled in support of its RI-

5

CO claim. The court also upheld Chevron's common law fraud claim, on a "third-party reliance" theory, although it dismissed some other common law tort claims. Stratus does not address these now-dismissed tort claims at any length in its Oppositions. The New York court has not yet ruled on Stratus's motion to dismiss, and did not reach any of the issues raised by Stratus in that motion—or in its Oppositions here—in resolving Donziger's motion to dismiss.

To correct Stratus's misrepresentations about Chevron's RICO Complaint and to set the record straight about the ample evidence of Stratus's intentional wrongdoing, Chevron respectfully seeks this Court's permission to submit this brief *amicus curiae*.

## II.    FACTUAL BACKGROUND

As explained in detail in Chevron's Complaint, Stratus was hired by Steven Donziger, a New York lawyer, to ghostwrite the report of a Special Master in the Ecuadorian litigation, and then to publicly promote that report as an "independent" assessment of Chevron's liability for alleged environmental damage in the Oriente region of Ecuador. Donziger, along with other U.S. and Ecuadorian lawyers, had been pursuing multiple lawsuits for years, first against Texaco, Inc. and then, after a subsidiary of Chevron merged with Texaco, against Chevron. *See* Dkt. 39-6 ¶¶ 58-67 (hereinafter, the "FAC"). By 2006, however, the litigation was not going well for Donziger and the LAPs. Pursuant to the court-directed Ecuadorian "judicial inspection" process, a panel of independent experts had evaluated the first of what was to be 122 oil production sites, and found that there was no evidence of contamination posing a risk to either human health or the environment. *Id.* ¶ 99. Accordingly, Donziger and his co-conspirators changed tacks—they successfully pressured the Ecuadorian court to abandon the judicial inspections in favor of a single global expert, or "perito," whose report (the "Peritaje Global") would determine liability and

6

damages. *Id.* ¶¶ 72-77, 122-25. And they arranged for that expert to be Cabrera, whom they had already secretly recruited and whose report they would ghostwrite in its entirety. *Id.* ¶¶ 122-40.

It was during this period that Stratus joined the conspiracy. Donziger retained Stratus not only to write the report that would be submitted under Cabrera's name, but to publicly promote that report, without disclosing its authorship, to the press, to the financial community, and to U.S. federal and state governmental agencies. *Id.* ¶¶ 145, 159-60.

In this role, Stratus participated in at least two meetings with Cabrera, including a meeting in March 2007 just before he was officially appointed by the court, and then a second one in January 2008 while Stratus was in the midst of writing the report to which it affixed his name. *Id.* ¶¶ 129, 154. At the March 2007 meeting, Donziger's co-counsel Pablo Fajardo presented to, among others, Anne Maest and Cabrera the work plan by which Stratus would write Cabrera's report. *Id.* ¶¶ 129-34. When Fajardo explained that everyone on the team would work together on the report, Maest demonstrated that she understood the secret and improper nature of the scheme when she corrected him, "[b]ut not Chevron." *Id.* The next day, Donziger made it clear to Maest that the report Stratus was to write should not be bound by the evidence (or, as Donziger characterized it, "smoke and mirrors and bullshit"), but should simply set forth the plaintiffs' "theory" as fact, regardless of the evidence. *Id.* ¶ 134. Maest did not object to this approach. *Id. In fact, she executed it.*

On March 19, 2007, the Lago Agrio court appointed Cabrera as "court expert" for a global damages assessment requested by Plaintiffs. *Id.* ¶ 138. Stratus would later assert that Cabrera was appointed to act "in the capacity of a neutral 'expert' to the Court[.]" *Id.* ¶ 177. Cabrera "sw[ore] to perform his duties faithfully . . . with *complete impartiality and independence vis-à-*

7

*vis the parties.*" *Id.* ¶ 141 (emphasis added). But by the time Cabrera was sworn in, Stratus and the LAPs' other consultants had already met clandestinely with Cabrera to plan his report.

The following month, Donziger and Stratus met in Boulder to further discuss ghostwriting the Cabrera Report and decided that Stratus would take the lead on drafting the report. *Id.* ¶ 145. Before that meeting, David Chapman, a principal at Stratus, emailed Donziger to propose that "Stratus d[o] much of the work, putting the pieces together and writing the report." *Id.* ¶ 145. According to Donziger, Stratus had "a fair amount of discretion," including the authority to eliminate sections of the report if Stratus could not complete them on time. *Id.*; *see also id.* ¶ 149. "[T]he general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera." *Id.* ¶ 149.

In January 2008, Cabrera and Plaintiffs' counsel and consultants met again in Quito, Ecuador. *Id.* ¶ 154. Maest and Beltman attended. *Id.*

The Complaint documents Stratus's authorship of the report by referring to the hundreds of emails the individual Stratus Defendants exchanged with one another and with Donziger and other conspirators as they were drafting. *Id.* ¶ 147. In February 2008, Beltman sent a document containing his "rough start of the Peritaje Global report" to Donziger for comments on the "tone, language level, and content." *Id.* ¶ 150. On March 12, Beltman forwarded a document to translators entitled "Peritaje Global Summary Report" that was pre-dated March 24, 2008 and contained an introduction stating, "[t]his report was written by Richard Cabrera, ING to provide expert technical assistance to the Court." *Id.* ¶ 152. In fact, Stratus was responsible for creating the illusion that Cabrera had written the report, assisted only by Ecuadorians not publicly associated with the LAPs. *Id.* ¶¶ 129-31, 158, 160, 169, 292. Beltman personally ensured that the names of

8

the true authors of each annex to the report were "taken off," and he maintained a master schedule that tracked who was actually writing each portion of the report, and to whom they would be falsely attributed in the Cabrera Report. *Id.* ¶ 153. Stratus also oversaw the task of making the report appear to have been originally drafted in Spanish and crafting the language so that it would "sound more like" it had been written by Cabrera. *Id.* ¶¶ 152-53, 167, App. B. No. 103.

Once the report was filed in Lago Agrio, Stratus engaged in an elaborate ruse to further the false impression that Cabrera had independently prepared "his" report. After drafting the main body of the Special Master's report and most of its annexes, Stratus prepared questions and comments on the report for submission to the court, criticizing its own analysis. *Id.* ¶ 165. Stratus then ghostwrote "Cabrera's" responses to those objections, adopting its own suggestions and raising the damage assessment to over $27 billion. *Id.* ¶ 166.

In addition to these fake "objections," Stratus also played a significant role in publicizing the report, falsely promoting it as the "independent" work of an Ecuadorian "Special Master." To this end, Stratus prepared a fraudulent "review" of the report for public distribution, falsely claiming the report was "prepared by Ing. Richard Cabrera Vega" who was "acting in the capacity of a neutral 'expert' to the Court" and as the equivalent of a "Technical Special Master" in the United States. *Id.* ¶¶ 175-79.[2] Stratus also recruited unwitting accomplices to provide third-party endorsements of the ghostwritten report (*id.* ¶¶ 180-84), made false statements about Cabrera's independence to members of Congress (*id.* ¶ 244), and drafted false and misleading

---

[2] A U.S. lawyer retained by the LAPs characterized the implications of this submission as follows: "These 'comments' are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in 'ghosting' the Cabrera report. . . . [I]t appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." FAC ¶ 179.

9

information about the report in a Chevron shareholder resolution (*id.* ¶ 254).

Finally, Stratus actively supported the criminal scheme by taking steps to prevent disclosure of the true authorship of the Cabrera Report, demonstrating its knowledge of its own wrongdoing.  Beltman emailed Donziger to alert him to the "[u]rgent issue" of co-conspirator Karen Hinton wanting to give to a reporter a report authored by Richard Clapp, one of the real, but secret, drafters of portions of the Cabrera Report.  *Id.* ¶ 158.  Had this report been distributed, the truth that the RICO Defendants and their co-conspirators actually wrote the Cabrera Report would have been exposed.  Actively managing the enterprise, Beltman told Donziger that they "need[ed] to be careful about this."  *Id.*  When a similar issue regarding another report drafted by Clapp arose, Beltman warned Donziger, "I don't think we should hand out either [report] as Clapp's, *thereby distributing proof.*"  *Id.* ¶ 169 (emphasis added).  Later, upon learning that Clapp had promised Congressman McGovern a copy of a "5-pager" that Beltman anticipated would be used in "Cabrera's" responses to the LAPs' objections, Beltman told Donziger:  "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by him.  You want to talk to him, or me?"  *Id.* ¶ 158.  This close call that might have exposed the ghostwriting prompted Beltman to write to Donziger, "Oh what a tangled web, . . . ."  *Id.* ¶ 159.  He did not need to complete the phrase.[3]

It was the subpoenas issued by this District that ultimately untangled that web and exposed Stratus's fraud.  In a series of orders in the spring and summer of 2010, Judge Kane and Magistrate Judge Hegarty authorized Chevron's issuance of subpoenas to Stratus and various affiliated individuals seeking evidence of the ghostwriting, and then denied a series of motions

---

[3] "O, what a tangled web we weave, [¶] When first we practice to deceive!"—Sir Walter Scott, *Marmion*.

by the LAPs and the Republic of Ecuador seeking to delay or stop Chevron's discovery. *See generally Chevron Corp. v. Stratus Consulting, Inc.*, No. 1:10-cv-00047-MSK-MEH (D. Colo.) (hereinafter "Stratus 1782 Action"). As that and related litigation unfolded, Stratus and those working under its direction engaged in a wide array of obstructive conduct, including tampering with the testimony of prospective witnesses (*id.* ¶¶ 160, 274), providing false and misleading deposition testimony (*id.* ¶¶ 274, 292), disposing of relevant documents (*id.* ¶ 276), and making false and misleading statements to this Court (*id.* ¶ 275). Through counsel, it affirmatively misled Magistrate Judge Hegarty, assuring him that the Stratus Defendants were "astonish[ed]" to learn that their work product had appeared in the Special Master's report, that they had never met with Cabrera, that they did not have "an opportunity to review Cabrera's report in draft form," and that the work product they provided the LAPs was for a "mediation," and not "to assist Cabrera." *Id.* ¶ 275. When subsequent discovery confirmed that these statements were false, Judge Hegarty found that he "was not given the truth." Stratus 1782 Action, Dkt. 335 at 4.

### III.   ARGUMENT

**A.   Chevron's Complaint Includes Extensive, Detailed, and Specific Allegations Against Stratus**

Chevron's Complaint in the RICO Action includes over 300 paragraphs of detailed factual allegations replete with direct quotations by the defendants and others, and precise descriptions of conduct, including dates, locations, and individuals. With respect to the Stratus Defendants, the Complaint extensively describes their wrongdoing. In its Oppositions, Stratus ignores these allegations, and instead tries to distract the Court by pointing to *other* parts of the Complaint, such as summary paragraphs, or passages providing context or directed at other defendants. These subterfuges, however, are without force.

11

1.     **Chevron's Use of the Term "RICO Defendants" Does Not Erase the Extensive Individual Allegations Concerning Stratus**

Stratus objects to the Complaint's use of the term "RICO Defendants." Referring to this as "impermissible lumping" (Dkt. 46 at 14; Dkt. 48 at 17; *see also* Dkt. 47 at 21), Stratus includes an Appendix listing each use of the term (Dkt. 46 at App. A), but ignores the more than 200 specific references, by name, to Stratus Consulting, Douglas Beltman, and Ann Maest.[4] Stratus does not and cannot argue that the Complaint's use of the term "RICO Defendants" erases these other, specific factual allegations. It simply ignores them.

Chevron's Complaint covers more than just Stratus's wrongdoing because the Stratus Defendants are not the only defendants in the RICO Action. The Complaint describes a pattern of racketeering activity carried out by a criminal enterprise, of which Stratus was a significant part—but not the only member. That wrongdoing extends beyond the ghostwriting and promotion of the Special Master's report, and includes a wide array of criminal and tortious acts. That activity included colluding with the Republic of Ecuador to bring baseless criminal charges against two Chevron attorneys (FAC ¶¶ 199-221); launching highly public and personal attacks on individual Chevron executives, including harassment at their homes and their mock execution at a rally in Ecuador (*id*. ¶¶ 212, 223); making outrageous, and knowingly false, claims that Chevron had threatened, robbed, and indeed *murdered* individuals associated with its scheme (*id*. ¶¶ 261-64); and crafting a web of contracts and trusts that ensured that the lawyers, financiers, and advisors perpetrating this scheme would recoup at least millions, and possibly billions of dollars from its crimes, and would control every penny recovered, with no compensation to the

---

[4] *See* FAC ¶¶ 82, 129, 131, 134, 145-54, 156-60, 162, 167-69, 175-79, 181-84, 196, 198, 216, 233-35, 240, 243-44, 251, 254, 270-71, 273-76, 278-79, 281-84, 287, 290, 292, 296-97, 305, 328.

"plaintiffs" (*id*. ¶¶ 329-30). What role Stratus played in this additional activity is not yet known, but those acts are nonetheless relevant to Chevron's claims against the criminal enterprise of which Stratus was an important member.

      **2.     The Complaint's Introductory and Summary Sections Do Not Erase the Many Specific and Substantive Allegations Elsewhere in the Complaint**

In light of the Complaint's length and complexity, covering as it does years of wrongdoing on two continents by dozens of individuals, Chevron included in the Complaint extensive introductory material, including a thorough presentation of the basis for the Court's jurisdiction (FAC ¶¶ 1-32), and a comprehensive summary section at the end, as part of the first claim for relief, that reviews the allegations that satisfy RICO's complex, multi-faceted requirements (*id*. ¶¶ 339-79). Stratus seizes on this, and, in its Oppositions and in an Appendix filed therewith, uses the summary material to mischaracterize the Complaint. Dkt. 46 at 15; *id*. at App. B; Dkt. 48 at 17-18; *id.* at App. A; *see also* Dkt. 47 at 21.

For example, Stratus protests that in the *first paragraph of the Complaint*, Chevron alleges that "the Stratus Parties joined a scheme to 'extort, defraud . . .' while propounding no evidence that the Stratus Parties ever did such a thing." Dkt. 46 at 15. But Stratus cannot evade Chevron's allegations by simply refusing to read beyond the first paragraph. And in its Appendix B, Stratus takes a similar approach, quoting paragraph after paragraph from the Complaint's claims for relief. But these paragraphs are summary in nature for the convenience of the reader, reviewing, as they do, over 300 paragraphs of detailed factual allegations—indeed, many of the paragraphs that Stratus claims contain "no specific factual allegations against Stratus" actually begin with the phrase, "[a]s described herein . . . ." *See, e.g.*, Dkt. 46, App. B at 4-5.

### 3. The Complaint Includes Numerous Allegations of Stratus's Wrongdoing

In addition to identifying portions of the Complaint that, in isolation, may not present specific allegations, Stratus also denies the existence of those specific allegations. It claims repeatedly that there are "no facts alleged" when there are numerous such facts alleged, sometimes even in the passages Stratus quotes to this Court, and it plays word games, asserting that activity such as sending emails is not wrongful, but disregarding the contents of those emails.

Quoting at length from one of Chevron's jurisdictional paragraphs (FAC ¶ 18) instead of the factual allegations themselves, and focusing not on the conduct of Defendants Beltman and Maest, but rather on that of Stratus employees Joshua Lipton and David Chapman (who are not defendants in either the RICO Action or this case), Stratus describes the allegations directed at Chapman and Lipton as "'coordinat[ing],' 'over[seeing]' and otherwise using . . . Stratus's resources to write and publicize the Cabrera Report," but claims this is "not illegal or wrongful conduct[.]" Dkt. 46 at 18; *see also* Dkt. 48 at 18. This, according to Stratus, is because "there are NO facts alleged that demonstrate that Cabrera was not an independent court expert, or that the Stratus Parties knew that he was anything but an independent court expert." Dkt. 46 at 18-19; Dkt. 48 at 24. But this is false—the Complaint details secret meetings between Stratus and Cabrera to plan the report that Stratus would write and Cabrera would file (FAC ¶¶ 129-34), the writing of that report in a form expressly intended to give the appearance it had been written by Cabrera (*id*. ¶¶ 145-55), and then Stratus's active involvement in concealing that relationship from Chevron, from the public, and from this District Court (*id.* ¶¶ 146, 148, 153, 154, 156-60, 167-69, 175-84, 273-75, 287, 92). It was Beltman, after all, who wrote to Donziger, "Oh what a tangled web. . . ." FAC ¶ 159.

Stratus likewise claims "there is NO evidence that Chapman perjured himself." Dkt. 46 at 19. But the Complaint alleges that Chapman swore under oath that he had no reason to be-

14

lieve that Stratus's work product was provided to Cabrera when in fact "it was Chapman who provided Donziger with the initial outline and plan for Stratus to write the 'damage estimate[.]'" FAC ¶ 274.  Stratus attempts to explain Chapman's emailed proposal to Donziger by arguing that "emailing is not a wrongful act" (Dkt. 46 at 19; *see also* Dkt. 48 at 18), but that is just a dodge—the email is the evidence that Chapman perjured himself when he later denied knowledge of the plan he himself devised.

Stratus's assertion that the Complaint is "devoid of any suggestion that the Stratus Parties . . . falsified results" is also untrue.  Dkt. 46 at 9; Dkt. 48 at 27 ("Chevron has not alleged that the Cabrera Report is scientifically erroneous or defective . . . .").  The Complaint includes four lengthy paragraphs covering falsehoods and flaws in the ghostwritten report .  *See* FAC ¶¶ 170- 73.  Among these: "The report includes millions of dollars of damages for remediation of disposal pits that do not exist," "the RICO Defendants relied on unreliable, manipulated sampling data that they selected in order to maximize their damages claims," "[t]hey would also change their analysis when the results were not coming out the way they wanted," and "[d]espite the failure to identify a single individual with cancer or produce a single medical report, the report initially assessed $2.9 billion for 'excessive cancer deaths[.]'" *Id.*

## IV.   CONCLUSION

In its Oppositions, Stratus makes numerous false statements and mischaracterizes Chevron's Complaint in the RICO Action.  The Court should reject them.

Dated: May 17, 2012

Respectfully submitted,


    /s/ Robert C. Blume
    Robert C. Blume

GIBSON, DUNN & CRUTCHER LLP
1801 California Street, Suite 4200
Denver, CO  80202-2642
Telephone:    303.298.5700
Facsimile:     303.298.5907

Attorneys for CHEVRON CORPORATION

16

## Appendix A:  *Fraud Findings by U.S. Courts*

**U.S. District Court for the Western District of North Carolina:**  "While this court is unfamiliar with the practices of the Ecuadorian judicial system, the court must believe that the concept of fraud is universal, and that what has blatantly occurred in this matter would in fact be considered fraud by any court.  If such conduct does not amount to fraud in a particular country, then that country has larger problems than an oil spill."  *Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1 :10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).  Dkt. 39-6 ¶ 302.

**U.S. District Court for the District of New Mexico:**  "The release of many hours of the outtakes has sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct."  *In re Chevron Corp.*, Nos. 1:10-mc-00021-22 (JH/LFG), slip op. at 3-4 (D.N.M. Sept. 2, 2010).  Dkt. 39-6 ¶ 302.

**U.S. District Court for the Southern District of California:**  "There is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own.  Thus, any privilege which existed was waived; Respondents' claim of privilege neither bars production of the subpoenaed documents nor gives [plaintiffs' technical consultant] Powers a basis for refusing to testify."  *In re Applic. of Chevron Corp.*, No. 10-cv-1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010).  Dkt. 39-6 ¶ 302.

**U.S. District Court for the Southern District of New York:**  "[T]here is more than a little evidence that [plaintiffs' lead U.S. counsel] Donziger's activities—as several courts already have held in the context of Section 1782 applications against experts involved on the Lago Agrio plaintiffs' side—come within the crime-fraud exception to both the privilege and to work product protection."  *In re Applic. of Chevron Corp.*, 749 F. Supp. 2d 141, 167 (S.D.N.Y. Nov. 10, 2010).  Dkt. 39-6 ¶ 302.

**U.S. Court of Appeals for the Third Circuit:**  "Though we recognize that the Lago Agrio Court may view what seems to us to be a conflict of interest differently than we do, we believe that this showing of [plaintiffs' technical consultant] Villao's dual employment is sufficient to make a prima facie showing of a fraud that satisfies the first element of the showing necessary to apply the crime-fraud exception to the attorney-client privilege."  *In re Applic. of Chevron Corp.*, 633 F.3d 153, 166 (3d Cir. Feb. 3, 2011).

**U.S. District Court for the District of New Jersey:**  "As far as the Court is concerned, the concept of an employee of a party covertly functioning as a consultant to a court appointed expert in the same proceeding can only be viewed as a fraud upon that tribunal[.]"  *In re Applic. of Chevron Corp.*, No. cv-10-2675 (SRC) (D.N.J. June 11, 2010) Hrg. Tr. at 43:13-44:16.  Dkt. 39-6 ¶ 302.

**U.S. District Court for the Southern District of New York:**  "There is ample evidence of fraud in the Ecuadorian proceedings.  The LAPs, through their counsel, submitted forged expert reports in the name of [technical expert] Dr. [Charles] Calmbacher.  Their counsel orchestrated a scheme in which [plaintiffs' technical consulting firm] Stratus ghost-wrote much or all of [court expert] Cabrera's supposedly independent damages assessment without, as far as the record discloses, notifying the Ecuadorian court of its involvement. . . .  When it became evident that the LAPs' improper contacts with Cabrera, including the pre-appointment meetings, ghost-writing, and illicit payments, would be revealed through the Section 1782 proceedings, LAP representatives undertook a scheme to "cleanse" the Cabrera report.  They hired new consultants who, without visiting Ecuador or conducting new site inspections and relying heavily on the initial Cabrera report, submitted opinions that increased the damages assessment from $27 billion to $113 billion."  *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 636 (S.D.N.Y. Mar. 7, 2011).

**U.S. District Court for the Southern District of New York:**  "As to the crime-fraud exception, I concluded that Judge Kaplan had made findings that required application of that exception to information relating to three different subjects: (1) the report to which an expert's name had fraudulently been appended (the 'Calmbacher report'); (2) the report that was purportedly independent but had been ghostwritten by agents of the LAPs (the 'Cabrera report'); and (3) the memoranda that were purportedly independent reports intended to supercede the Cabrera report, but which in fact simply repeated that report's findings (the 'cleansing memos')."  *Chevron Corp. v. Salazar*, No. 11-civ-3718, 2011 WL 3424486, at *3 (S.D.N.Y. Aug. 3, 2011).

**U.S. District Court for the District of Maryland:**  "I do think that probable cause has been established if for no other reason than for the production of the admittedly co-authored, or documents co-authored by [interns for the plaintiffs] the Pages, which has found its way into the decision in Ecuadorian court . . . .  So, at the end of the day, regardless of how I get there, and I get there, I get to the same place by at least four or five different routes. This information is very much discoverable. It is no longer privileged, and it is to be produced immediately." *Chevron Corp. v. Page*, No. RWT-11-1942, Oral Arg. Tr. at 10:17-21, 11:13-23 (D. Md. Aug. 31, 2011).

**U.S. District Court for the District of Washington D.C.:**  "[T]here is more than sufficient evidence of a prima facie case that [plaintiffs' consultant] the Weinberg Group's work was part of a fraud upon the Ecuadorian court."  *Chevron Corp. v. The Weinberg Group*, No. 11-mc-00409-JMF, slip op. at 8 (D.D.C. Sept. 8, 2011).