IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 11-cv-00715-RPM

NAVIGATORS SPECIALTY INSURANCE COMPANY,

      Plaintiff and Counterclaim Defendant,

v.

DOUGLAS BELTMAN;
ANN MAEST;
STRATUS CONSULTING, INC.,

      Defendants and Counterclaim Plaintiffs,

v.

HARTFORD FIRE INSURANCE COMPANY,
HARTFORD CASUALTY INSURANCE COMPANY, and
TWIN CITY FIRE INSURANCE COMPANY,

      Counterclaim Defendants.

---

## ORDER ON SUMMARY JUDGMENT MOTIONS

---

      Stratus Consulting, Inc., ("Stratus") is a Colorado corporation with its principal place of business in Boulder, Colorado.  Douglas Beltman and Ann Maest are employed by Stratus. They are the defendants in this civil action filed by Navigators Specialty Insurance Company ("Navigators"), seeking a declaratory judgment of no coverage for the defense of them in Civil Action No. 11-cv-00691 in the United States District Court for the Southern District of New York filed by Chevron Corporation in which they are named among multiple defendants.  They have answered and counterclaimed, adding Hartford Fire Insurance Company, Hartford Casualty Insurance Company and Twin City Fire Insurance Company as additional counterclaim defendants for declaratory judgment of duty to defend and duty to indemnify on their insurance policies with claims for damages for breach of contract, bad faith breach of contract and

violation of Colorado statutes, C.R.S. §§ 10-3-1115 and 1116 for unreasonable delay and denial

of insurance benefits.

This court has jurisdiction because of diversity of citizenship, 28 U.S.C. § 1332, and all parties agree that the law of Colorado is applicable.  At a scheduling conference on September 16, 2011, it was agreed that the legal issues would be decided based on motions for summary judgment, filed by the insurance companies, addressing the allegations made by Chevron in the underlying lawsuit and the relevant policy provisions.  That is in accord with Colorado law that the duty to defend is a question of law to be determined by comparing the underlying complaint with the coverage language of the policy to find whether the factual allegations made against the insured, if sustained, state a claim which is potentially or arguably within the policy coverage.  *Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083 (Colo. 1991).

Chevron filed its complaint on February 1, 2011, and an amended complaint on April 20, 2011.  The core factual allegations are that defendant Steven Donziger, an American lawyer, orchestrated a conspiracy to engage in a pattern of racketeering activity, the commission of criminal acts as part of a scheme to defraud and extort Chevron, and that all defendants participated in the operation and management of a criminal enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § § 1961, *et seq.,* (RICO).

Chevron alleged that a sham litigation was initiated against it in Lago Agrio, Ecuador, claiming damages for violation of the collective environmental rights of the affected communities to remediate alleged petroleum contamination in Ecuador's Oriente region, and that the defendants in the underlying action, including Stratus, Maest and Beltman, and their co-conspirators have sought to extort, defraud and otherwise tortiously injure Chevron by means of a criminal scheme to: (i) intimidate or corrupt the Lago Agrio court and obtain a fraudulent judgment against Chevron based on manufactured evidence of liability; (ii) collude with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys; and (iii) conduct a massive public pressure campaign designed to spread false and misleading

information about Chevron and the Lago Agrio litigation. Chevron has alleged that the ultimate objective of the criminal scheme is to cause damage to Chevron's reputation, to put personal psychological pressure on its top executives through threats and attacks through the media, forcing Chevron into a payoff.

Stratus is an environmental research and consulting firm which obtained three types of insurance protection involved here: a professional liability policy from Navigators, a directors and officers liability policy from Twin City, and a commercial general liability policy from Hartford with an additional umbrella policy from that company.

The Amended Complaint

The amended complaint names Stratus, Beltman and Maest among the RICO defendants and John Lipton, president of Stratus, with David Chapman, another Stratus employee, as non-party co-conspirators. The RICO enterprise and its purposes are described in the following paragraphs:

1. Over the course of several years, defendant Steven Donziger and his co-defendants and co-conspirators have sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States. It has been carried out by a U.S.-based enterprise comprised of, among others, U.S. plaintiffs' lawyers led by Donziger; U.S. environmental consultants, led by Stratus Consulting, Inc., Ann Maest, and Doug Beltman; their Ecuadorian colleagues, led by Pablo Fajardo and Luis Yanza; and their front organizations, the Amazon Defense Front and Selva Viva. These conspirators are collectively referred to herein as the "RICO Defendants." Their co-conspirators in the enterprise include, among others, U.S. law firms and attorneys, such as Joseph Kohn of Kohn Swift & Graf, P.C., Emery Celli Brinckerhoff & Abady L.L.P., Motley Rice LLC and Patton Boggs LLP; U.S. environmental "activists," such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; U.S. public relations consultants, such as Karen Hinton; and additional financiers, such as Russell DeLeon and the Burford Group.

2. The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it. The RICO Defendants have sought to inflict maximum "damage to [Chevron's] reputation," to put "personal psychological pressure [on] their top executives," to disrupt Chevron's relations with its shareholders and investors, to provoke U.S. federal and state governmental investigations, and thereby force the company into making a payoff.

3.   To effect this plan, the RICO Defendants and their co-conspirators initiated a sham litigation in Lago Agrio, Ecuador (the "Lago Agrio Litigation"), claiming to seek money damages for "collective environmental rights" of the "affected" "communities" to remediate alleged petroleum contamination in Ecuador's Orlente region.  The Lago Agrio Litigation was directed and funded in significant part from the United States by United States residents, such as Donziger and Kohn.  In prosecuting the Lago Agrio Litigation, the RICO Defendants and their co-conspirators have engaged in a series of corrupt acts. For example, they have submitted in the Lago Agrio Litigation fabricated evidence in the form of expert reports in the name of a U.S. environmental consultant, Dr. Charles Calmbacher, that he did not draft or approve.  They also pressured U.S. environmental consultant David Russell to generate an inflated $6 billion damages figure, which they never filed in Lago Agrio but instead touted in the press and, via co-conspirator Amazon Watch, submitted to the U.S. Securities and Exchange Commission in an attempt to trigger a Sarbanes Oxley investigation.  And they arranged the appointment of Richard Stalin Cabrera Vega ("Cabrera") as the Ecuadorian court's sole expert to conduct a "global damages assessment."  They then secretly met with Cabrera to plan his report and–in the United States–ghostwrote the report and its annexes that Cabrera adopted "pretty much verbatim."  The U.S.-based consultant RICO Defendants drafted "comments" purporting to criticize "the Expert's work and conclusions," even though they had written his initial report themselves, and then ghostwrote "Cabrera's" responses to their own "comments," increasing his fake damage assessment to more than $27 billion.  In addition, the RICO Defendants have adopted a strategy to intimidate Ecuadorian judges, whom they have described as "mak[ing] decisions based on who they fear the most, not based on what the laws should dictate," and they have colluded with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.

4.   To pressure Chevron in the United States, the RICO Defendants have cited this fabricated evidence, Cabrera's supposedly "independent" report and these trumped-up criminal charges in false statements to the U.S. Congress, the U.S. Department of Justice, state and federal regulatory agencies, including the Securities and Exchange Commission, the U.S. Media, and Chevron shareholders, among others.  They have also made false statements to U.S. courts in an attempt to cover up their wrongdoing and to obstruct Chevron's discovery efforts.  In fact, when U.S. Discovery proceedings were poised last March to require disclosure of the RICO Defendants' collusion with Ecuadorian court expert Cabrera, the RICO Defendants sought to delay the truth from coming out.  As one of the Ecuadorian lawyers told Defendant Donziger at the time, "the effects" of disclosure "are potentially devastating in Ecuador (apart from destroying the proceedings, all of us, your attorneys, might go to jail)."  U.S. counsel agreed, admitting in a remarkable series of internal emails that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's reports, but that Stratus was an active conspirator." Undeterred, however, Donziger and other U.S. counsel then conspired to "cleanse" the Cabrera scandal by submitting to the Lago Agrio court last September new expert reports which largely relied on the tainted "Cabrera" report, but hiked the damages sought to $113 billion.

In the 172 pages of the complaint and the 56 pages of Appendix A attached to it, Chevron described in great detail the conduct forming the basis for its claims.  The factual allegations include references to e-mails and other communications and deposition testimony obtained in discovery in federal district courts, including this district, pursuant to 28 U.S.C. § 1782.

The core allegations involving the defendants in this action are that Stratus prepared the report of Cabrera, appointed by the Lago Agrio court as its "global assessment expert" which the court relied on to find liability and damages.  Specific allegations as to these defendants include the following:[1]

(129)  On March 3, 2007, two weeks *before* the court appointed Cabrera, several members of the RICO defendants, including Maest, met with Cabrera to plan the report.  Pablo Fajardo Mendoza ("Fajardo") is counsel of record for the Amazon Defense Fund as well as counsel of record for the named plaintiffs in the Lago Agrio case.  In this meeting, Fajardo made it clear that this group of people would be writing the expert report, not Cabrera.  The meetings ended that day with Donziger commenting that they could "jack this thing up to thirty billion in one day."  (133).

(134) On March 4th, 2007, Maest and other defendants met with Donziger and told him that there was no evidence that contamination from the pits had spread into the surrounding

groundwater.  Donziger said that since this was in Ecuador, you could "get what you want" by simply taking the existing evidence and extrapolating based on a theory and get money for it.

 (145) David Chapman, a principal at Stratus, e-mailed Donziger proposing that "the way this would work best is that if Stratus did much of the work, putting the pieces together and

---

[1]These are paraphrases of the allegations made in the numbered paragraphs of the Amended Complaint.

writing the report."  Shortly after this e-mail on April 27, 2007, there was a meeting at Stratus in

Boulder, CO to discuss how they could "jack this thing up to thirty billion."  At the meeting were

several defendants including Maest and Beltman.  As a result of the meeting, Stratus hired

Kohn Swift to provide technical assistance, including the production of reports and support in

discussions with the media.  By the fall of 2009, Stratus received at least $1.1 million in payment

for its work.

      Appendix A to the Amended Complaint lists some of the hundreds of e-mails that went

back and forth among Donziger, the Stratus defendants and Kohn Swift during the preparation

of the report.  (149) Beltman sent an e-mail out to the Stratus support team that said "We have

to write, over the next 2 to 3 weeks, probably the single most important technical document for

the case.  The document will pull together all of the work over the last 15 or so years on the

case and make recommendations for the court to consider in making its judgment."  Donziger

has admitted that "the general idea" was "that Stratus would draft the report in a form that it

could be submitted directly to the Ecuadorian court by Mr. Cabrera."

      (152) On March 12, 2008, Beltman sent, via e-mail with a copy to Maest, the actual

Cabrera Report . . . to be translated into Spanish for filing with the Lago Agrio court.  The

defendants made sure all names of the actual authors were removed from documents, and full

credit was given to Cabrera.

      (154)  Cabrera met with the team writing the document in January 2008 to discuss the

progress.  At most, Cabrera had a few hours to skim the report and the 4,000 pages of

supporting material, but he made no changes and could not have given it a substantive review.

The final copy was finished the day before it was filed.

      A large cover up scheme went on after the report was written.  The defendants had to

make sure that none of the annexes to the report were published elsewhere.  (160) Beltman

attempted to influence the testimony of Stratus employees who might be called to testify by

holding staff meetings and providing misleading information to the employees.

(167) After the report was filed, Stratus wrote questions about the report, drafting them

to look as though someone in Ecuador could have written them.  Then, Stratus secretly drafted

the answers to the questions.  Stratus also tried to recruit other consultants and academics to

endorse the report.  However, Beltman explained "we're having better success with consultants

being willing to sign endorsements than academics (something I am not proud of)."  (181)

The next phase of the RICO defendants' conspiracy was to convince the media that

Chevron was the "bad guy".  (233) As well as portraying the Cabrera report as written by

Cabrera, the RICO defendants also used the fraudulent "evaluation" drafted by Stratus to

enhance the credibility of the Cabrera Report in the media.

Navigators Policy

Navigators issued Policy No. CH10EPP803704 NC, a Commercial Lines Environmental

Policy for professional liability and related coverages to Stratus for the policy period from

October 8, 2010, to October 1, 2011.  The insuring agreements and exclusions are described in

the Professional's Environmental Risk Management Toolkit ("PERMT").  The policy was

cancelled on May 27, 2011.  (Ex. 1 to Plaintiff's Summary Judgment motion.)

The Policy contains the following exclusion ("Exclusion 7") in **SECTION I. COVERAGES**

**AND COVERAGE EXCLUSIONS, F. Common Policy Exclusions Applicable to All**

**Coverages** of the PERMT form:

With respect to all coverages, this policy does not apply to any **loss**:

…

**7.    Intentional Acts**
based upon or arising out of a **responsible insured's** (1) dishonest,
fraudulent, malicious or knowingly wrongful act, error or omission; or (2)
willful or deliberate failure to comply with any material statute, regulation,
ordinance, administrative complaint, notice of violation, directive, order, or

7

instruction made by or on behalf of any governmental body or agency.

However, with respect to coverage **A. Professional Liability**, whenever coverage under this policy would be excluded because of any dishonest, fraudulent, malicious, or knowingly wrongful act, error, omission, **we** agree that such insurance as would otherwise be afforded under this policy will be applicable with respect to those insureds who did not personally participate or personally acquiesce in or remain passive after having knowledge of such conduct. Each such innocent insured must promptly comply with all provisions of this policy upon learning of any concealment.

(**Ex. 1, PERMT Form, p. 6)**.

The term "responsible insured" is defined in Section V of the Policy to mean "any of **your** (1) owners, officers, directors, or partners; or (2) managers, supervisors, or licensed professionals; or (3) employees that are responsible for environmental affairs, control or compliance." (**Ex. 1, PERMT, p. 17)**.  The terms "you" and "your" refer to Stratus. The Complaint and Amended Complaint allege that Beltman is an Executive Vice President of Stratus, and that Maest is a Managing Scientist at Stratus. (**Ex. 2., ¶¶15, 16; Amended Complaint ¶¶ 5.6**. Therefore, both Beltman and Maest qualify as "responsible insureds" under the stated definition. Furthermore, the Complaint and Amended Complaint allege that Lipton is the President of Stratus, and that Chapman is a Principal and head of the natural resource economics group at Stratus. (**Amended Complaint ¶ 11 and Ex. A,¶ 274**). Therefore, Lipton and Chapman also qualify as "responsible insureds" under the Policy.

The terms "dishonest, fraudulent, malicious, or knowingly wrongful…" are not defined in the Policy and, thus, must be given their plain and generally accepted meaning. *See, e.g., Bohrer v. Church Mut. Ins. Co.*, 965 P.2d 1258, 1262 (Colo. 1998). The Colorado Supreme Court has held that "'dishonest' is a synonym for 'untruthful'," *In Re: Plaintiff: The People of the State of Colorado v. Segovia*, 196 P.3d 1126, 1132 (Colo. 2008), and has construed the phrase "fraudulent or dishonest" in an insurance context to mean an act "for a wrongful purpose and moral obliquity. Such an act must be one done in bad faith involving a breach of honesty to such

an extent as to amount to official dishonesty and lack of moral character." *Western Surety Co. v. May Mercantile Assoc.*, 283 P.2d 959, 961 (Colo. 1955). *See also The People of the State of Colorado v. Katz*, 58 P.3d 1176, 1189 (Colo. O.P.D.J. 2002) ("'dishonesty'… encompasses fraudulent, deceitful, or misrepresentative behavior. In addition to these, however, it encompasses conduct evincing 'a lack of honesty, probity or integrity in principle; a lack of fairness and straightforwardness…' Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.") The elements of fraud under Colorado law have been stated to be:

> (1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it is false; (3) ignorance on the part of the one to whom the representation is made of the falsity; (4) representation made with intention that it be acted upon; (5) representation resulting in damage.

*Kinsey v. Preeson*, 746 P.2d 542, 550 (Colo. 1987) (citations omitted).

The term "malicious" includes "acts done intentionally or with willful disregard of likelihood of damage…." *United States of America v. Wiktor*, 146 F.3d 815, 818 (10th Cir. 1998) (defining term "maliciously"). *See also Richards v. Sanderson*, 89 P. 769, 772 (Colo. 1907) ("Maliciously…means a wrongful act done intentionally, without just cause or excuse…"); *Bonidy v. Vail Valley Center for Aesthetic Dentistry*, P.C., 232 P. 3d 277, 286 (Colo. App. 2010) (*Webster's Dictionary* defines 'malice' as 'an intention or desire to harm another [usually] seriously through doing something unlawful or otherwise unjustified' or 'revengeful or unfriendly feelings'"). Finally, the term "knowingly" is defined as "'with knowledge; consciously; intelligently; willfully, intentionally,'" *City of Englewood v. Hammes*, 671 P. 2d 947, 953 (Colo. 1983) (quoting definition from *Black's Law Dictionary*, 5th ed. (1979)), and "'wrongful' means 'unlawful' or 'unjust.'"  *Sears v. Penrose Hospital*, 942 P. 2d 1345, 1348 (Colo. App. 1997) (quoting definition from *Webster's Third New International Dictionary* 2642), *overruled on other grounds*, *Holliday v. Bestop, Inc.*, 23 P. 3d 700 (Colo. 2001).

9

The Stratus defendants argue that the Chevron Amended Complaint alleges facts that may support a claim for negligence and suggest that while it may be that they should have known that something was not legitimate in the relationship among Donziger, Fajardo, the Ecuadorian plaintiffs and Cabrera, the work done in connection with the Cabrera report may have only been negligent.  While Chevron has alleged negligence as a legal theory for recovery, the factual allegations for that claim are the same as the RICO allegations.

The detailed factual allegations concerning the Stratus defendants adequately allege conduct coming within the exclusion, negating any duty to defend the New York action by Navigators.

The plaintiff claims that Stratus falsely denied knowledge of any awareness of facts, circumstances or situations which may reasonably result in a claim for which coverage was being sought when Joshua Lipton signed the application for insurance, on or about October 18, 2010.  (Amended Complaint ¶ 71).  That would preclude coverage under Sections 1.A.1., reading as follows:

**A.  Professional Liability**

**1.  Third-Party Claims**

**We** will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as **professional damages** resulting from claims(s) **based** upon any actual or alleged act, error, or omission in the performance of **professional services** by **you** or on **your** behalf, if
. . .
**b.**  as of the **inception date** of this policy, **you** are not aware of any such act, error or omission that might reasonably be expected to result in a **claim**,....

There is a subjective component to this policy provision which depends upon a factual presentation which is beyond the scope of Fed.R.Civ.P. 56.

It is sufficient to grant declaratory relief of no coverage because of he Intentional Acts Exclusion 7.  (Cited above.)

<u>The</u> <u>Twin</u> <u>City</u> <u>Policy</u>

Twin City Fire Insurance Company issued Stratus a Private Choice Encore!!, number KB 0222839 policy for the period of October 1, 2010, to October 1, 2011 (the "Twin City Policy").

The Twin City Policy contains three coverage parts: ()1) Directors, Officers and Entity Liability Coverage; (2) Employment Practices Liability Coverage; and (3) Fiduciary Liability Coverage.  Of these, only the Directors and Officers Liability Coverage ("D&O Coverage") is at issue.

The Twin City Policy includes a number of exclusions limiting coverage, including a professional-services exclusion, which provides that Twin City shall not pay a loss:

> (F) In connection with any **Claim** based upon, arising from, or in any way related to the rendering of, or failure to render, any professional services for others, including, without limitation, services performed by the **Insureds** for or on behalf of a customer or client.

Here, the Chevron claims against the Stratus Parties are premised on their provision of "various environmental consulting services" to the U.S. plaintiffs' attorneys in the Ecuadorian litigation.  Chevron alleges that the Stratus Parties provided "various environmental consulting services," and "ghostwrote" the purportedly independent Cabrera Report filed in the Ecuadorian litigation.  The purpose of the report produced by the Stratus Parties was "to provide expert technical assistance to the Court," and was described as the "single most important technical document for the case."  The Stratus Parties allegedly were able to perpetrate the fraud precisely because of their professional status, utilizing the professional jargon of their specialized field to generate a convincing, albeit fraudulent, expert report.  They further traded off of their status as professionals by allegedly offering "commentary" on the ghostwritten report, claiming to endorse the conclusions contained in the report based on their independent exercise of professional judgment.

The Stratus Parties' provision of professional services was an integral part of the

alleged fraud scheme, and was not some incidental or irrelevant factor in the commission of

the alleged fraud.  The fact that the alleged scheme extended to periods and activities after the

completion of the Cabrera Report does not nullify the application of the professional-services

exclusion in this matter.  The exclusion bars coverage for any claim "*based upon, arising from,*

*or in any way related to* the rendering of, or failure to render, any professional services for

others, including, without limitation, services performed by the Insured for or on behalf of a

customer or client."

<u>The Hartford Policies</u>

Hartford Fire Insurance Company issued Stratus a Special Multi-Flex Policy containing

Commercial General Liability coverage for the policy period October 1, 2010, to October 1,

2011 ("Hartford Primary Policy").  Hartford Casualty Insurance Company issued Stratus an

Umbrella Liability Policy for the policy period October 1, 2010, to October 1, 2011 ("Hartford

Umbrella Policy").

The CGL coverage part provides in pertinent part that:

> We will pay those sums that the insured becomes legally
> obligated to pay as damages because of "personal and
> advertising injury to which this insurance applies.  We will have
> the right and duty to defend the insured against any "suit" seeking
> those damages.  However, we will have no duty to defend the
> insured against any "suit" seeking damages for "personal and
> advertising injury" to which this insurance does not apply. . . .

Hartford Primary Policy, Personal and Advertising Injury Liability, ¶ 1.a., b., at 5 of 18.

> "Personal and advertising injury" is defined as "injury, including
> consequential 'bodily injury', arising out of one or more of the following
> offenses:
>
> \* \* \*
>
> **b.**    Malicious prosecution
>
> \* \* \*
>
> **d.**    Oral, written or electronic publication of material that slanders or
> libels a person
> or organization of disparages a person's or organization's goods,
> products or services. . . .

Hartford Primary Policy, Personal and Advertising Injury Liability Definitions, ¶ 17, p. 17.

The Primary Policy also contains a number of exclusions limiting coverage.  For example:

> This insurance does not apply to:
>
> **a.      Knowing Violation Of Rights Of Another**
>
> "Personal and advertising injury" arising out of an offense committed by, at the direction or with the consent of acquiescence of the insured with the expectation of inflicting "personal and advertising injury."
>
> **b.      Material Published With Knowledge Of Falsity**
>
> "Personal and advertising injury" arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.

Hartford Primary Policy, Personal and Advertising Injury Liability Exclusions, ¶ 2., p. 6.

The Primary Policy further contains two key endorsements limiting coverage.  The first such endorsement, Endorsement CG22 33 07 98–"Exclusion–Testing Or Consulting Errors and Omissions"–amends the policy to exclude coverage for "'personal and advertising injury' arising out of:"

> **1.**      An error, omission, defect or deficiency in:
>
> **a.**      Any test performed/ or
>
> **b.**      Any evaluation, a consultation or advice given, by or on behalf of any Insured;
>
> **2.**      The reporting of or reliance upon any such test, evaluation, consultation or advice; or
>
> **3.**      An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.

Hartford Primary Policy, Endorsement CF 22 33 07 98.

The second such endorsement, Endorsement CG 22 43 07 98–"Exclusion–Engineers, Architects or Surveyors Professional Liability"–amends the policy to exclude coverage for

"'personal and advertising injury' arising out of the rendering of or failure to render any professional services by you or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity." **Ex. 3**, Hartford Primary Policy, Endorsement CG 22 43 07 98.  The endorsement provides that:

> Professional services include:
>
> 1.  The preparing, approving, or failing to prepare or approve maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; and
>
> 2.  Supervisory, inspection, architectural or engineering activities.

Hartford Primary Policy, Endorsement CG 22 3 07 98.

Similarly, the Umbrella Policy provides that:

> We will pay those sums that the "insured" becomes legally obligated to pay as "damages" in excess of the "underlying insurance" . . . because of . . . "personal and advertising injury" to which this insurance applies caused by an "occurrence" . . . .

Hartford Umbrella Policy, Section I - Coverages, at p. 1.

The Umbrella Policy also defines key terms, including the following:

> "Occurrence" means
>                                             ****
> 2.  With respect to "personal and advertising injury": an offense described in one of the numbered subdivisions of that definition in the "underlying insurance".
>                                             ****

Hartford Umbrella Policy, Section VII – Definitions, p. 13.

The policy also contains an exclusion for "Personal And Advertising Injury":

> 4.  This policy does not apply to "personal and advertising injury".
>     **EXCEPTION**
>     This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to claims arising out of that "Personal and advertising injury".

Hartford Umbrella Policy, Section I, p.3.

14

Finally, the policy contains two exclusionary endorsements materially identical to those in the Primary Policy.  The first, titled "Exclusion – Engineers, Architects or Surveyors Professional Liability," provides that:

> This policy does not apply to:
>
> **1.** "Bodily injury";
>
> **2.** "Property damage"; or
>
> **3.** "Personal and Advertising Injury"
>
> Arising out of the rendering of or failure to render any professional Services by or for any "insured";
>
> Including:
>
> **1.** The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs, or specifications; and
>
> **2.** Supervisory, inspection or engineering services.

Hartford Umbrella Policy, Endorsement XL 21 13 11 00.

The second, titled "Exclusion – Testing or Consulting Errors and Omissions," provides that:

> This policy does not apply to any liability for bodily injury,' 'personal and advertising injury,' or 'property damage' arising out of
>
> **1.** An error, omission, defect or deficiency in:
>
>> **a.** Any test performed; or
>>
>> **b.** An evaluation, a consultation or advice given, by or on behalf of any insured; or
>
> **2.** The reporting of or reliance upon any such test, evaluation, consultation or advice; or
>
> **3.** An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data.

Hartford Umbrella Policy, Endorsement XL 21 67 11 00.

15

The Stratus parties contend that Chevron's claims against them are for "personal and advertising injury" because the essence of Chevron's case is that they participated in a malicious prosecution of the Lago Agrio litigation.  The difficulty with that claim is that under Colorado law there is no claim until the litigation is resolved in the plaintiff's favor.

The Stratus parties also claim that Chevron has accused them of slander, libel or disparagement.  That is a closer analogy, although Hartford has identified missing elements of such a claim under Colorado law.  It is not necessary to pursue that legal analysis because coverage is barred by the exclusions cited above.

The Chevron Action is entirely premised on the alleged scheme by the Stratus Parties and others to intentionally "extort, defraud, and otherwise tortiously injury" the Chevron Corporation.

The Chevron Action is replete with allegations that the Stratus Parties' composition of the Cabrera Report and related materials "was intended to deceive" by making "deliberate misrepresentations" and perpetuating "deliberate falsehoods," which they did "knowingly and intentionally . . . and with [the] intent to deceive."

The "Knowing Violation Of Rights Of Another" exclusion makes clear that there can be no coverage for knowing and intentional violations of the law, which is exactly what Stratus is alleged to have done in the Chevron action.

The policy bars coverage for "'Personal and advertising injury' arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity.'"  **Ex. 3**, Hartford Primary Policy, Personal and Advertising Injury Liability Exclusions, ¶ 2.b., p. 6.  This exclusion bars coverage because the Chevron Action is replete with allegations of intentional misrepresentations.

The allegations in the Chevron Action assert that the Stratus Parties made "false and misleading public statements," and "made these false representations while knowing that their

16

misrepresentations were materially false and/or that their omissions were material." The thrust of the claims against the Stratus Parties is the fabrication and publication of the Cabrera Report and supporting material. The Stratus Parties "disseminat[ed] false statements about Chevron through [their] authorship of the Cabrera Report and through [their] later 'evaluation' of that report." **Ex. 1-2**, ¶¶ 372-374; Amended Complaint, ¶ 372-374. The Stratus Parties also "participated in a campaign of public attacks based on false and misleading statements about Chevron." *Id.*

The "Testing Or Consulting Errors and Omissions" exclusionary endorsement bars coverage for "'personal and advertising injury' *arising out of*: . . . 1. An error, omission, defect or deficiency in: a. Any test performed; or b. An evaluation, a consultation or advice given, by or on behalf of any insured; 2. The reporting of or reliance upon any such test, evaluation, consultation or advice; or 3. An error, omission, defect or deficiency in experimental data or the insured's interpretation of that data." **Ex. 3**, Hartford Primary Policy, Endorsement CG 22 33 07 98 (emphasis added). Because the claims against the Stratus Parties "aris[e] out of" the "evaluation" or "consultation" provided in the form of the Cabrera Report and related documentation, this exclusion bars all coverage here.

The "Engineers, Architects or Surveyors Professional Liability" exclusionary endorsement bars coverage for injury "*arising out of* the rendering of, or failure to render, *any professional services by you* or any engineer, architect or surveyor who is either employed by you or performing work on your behalf in such capacity." **Ex. 3**, Hartford Primary Policy, Endorsement CG 22 43 07 98 (emphasis added). Because this endorsement excludes coverage for claims that "aris[e] out of ... any professional services by [the Stratus Parties]," and the allegations against the Stratus Parties in the Chevron Action arise out of the Stratus Parties' provision of professional services to the plaintiffs' lawyers in the Ecuadorian lawsuit, this endorsement bars coverage for the Chevron Action.

17

Because coverage under the primary policy is bared by the exclusions discussed above, thee is no coverage under the umbrella policy.

Upon the foregoing, it is

ORDERED and ADJUDGED that Navigators Specialty Insurance Company has no duty to defend Douglas Beltman, Ann Maest and Sratus Consulting, Inc., as defendants in Civil Action No. 11-cv-00691 in the United States District Court for the Southern District of New York because the claims alleged against them in that action by Chevron Corporation are within Exclusion 7 of Policy No. CH10EPP803704 NC.  It is

FURTHER ORDERED and ADJUDGED that Twin City Fire Insurance Company has no duty to defend Douglas Beltman, Ann Maest and Sratus Consulting, Inc., as defendants in Civil Action No. 11-cv-00691 in the United States District Court for the Southern District of New York because the claims alleged against them in that action by Chevron Corporation are within the professional services exclusion of Policy No. KB 0222839.  It is

FURTHER ORDERED and ADJUDGED that Hartford Fire Insurance Company and Hartford Casualty Insurance Company have no duty to defend Douglas Beltman, Ann Maest and Sratus Consulting, Inc., as defendants in Civil Action No. 11-cv-00691 in the United States District Court for the Southern District of New York because the claims alleged against them in that action by Chevron Corporation are within the exclusions of the Special Multi-Flex Policy containing Commercial General Liability Coverage for the policy period October 1, 2010, to October 1, 2011, and the Umbrella Liability Policy for the same period as cited above.

DATED:   November 1st, 2012

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior Judge